1

2

3

4

5

6

7

8

9                        UNITED STATES DISTRICT COURT

10                      EASTERN DISTRICT OF CALIFORNIA

11                             ----oo0oo----

12

13

14   KIRSTEN FISHER, ON BEHALF OF
     HERSELF AND AS GUARDIAN AD
15   LITEM FOR HER MINOR CHILDREN,
     HALEY FISHER, MCKENSEY FISHER-
16   MATHIS,

17          Plaintiff,                    NO. CIV. S-05-771 FCD/DAD

18      v.                                <u>MEMORANDUM AND ORDER</u>

19   PLACER COUNTY, TRACY MAE
     ALVAREZ, ANTOINETTE FABELA,
20   KEVIN HENDERSON, DIANE ROSE,
     GREG GEISLER,
21

22          Defendant.

23                             ----oo0oo----

24      Plaintiff Kirsten Fisher ("Fisher"), on behalf of herself

25   and as guardian ad litem of her minor children, Haley Fisher and

26   McKensey Fisher-Mathis ("children")[1], has filed claims for

27   _____

28          [1]   Because some claims are asserted on behalf of the
     children, the court refers to Fisher and her children,
     collectively, as "plaintiffs."

1   violations of the Federal Civil Rights Act, 42 U.S.C. § 1983, and

2   state tort claims based on the removal of her children.[2]

3   Plaintiffs seek both monetary and injunctive relief.   Defendants

4   Placer County, Tracy Mae Alvarez, Antoinette Fabela, Kevin

5   Henderson, Diane Rose, and Greg Geisler (collectively

6   "defendants") now move for summary judgment, or in the

7   alternative, summary adjudication pursuant to Federal Rule of

8   Civil Procedure 56(b).[3]   Plaintiffs oppose the motion.   For the

9   reasons stated herein, defendants' motion for summary judgment is

10   GRANTED.

**BACKGROUND[4]**

12       In December 2003, Dr. Mark Knoble, plaintiffs' family

13   physician, contacted Placer County Health and Human Services

14   ("HHS"), Adult Systems of Care, and expressed concern about

15   Fisher's ability to care for her two daughters.   (SUF ¶ 1).

---

[2]       Because oral argument will not be of material
assistance, the court orders this matter submitted on the briefs.
E.D. Cal. L. R. 78-230(h).

[3]       Unless otherwise stated, further references to a "Rule"
are to the Federal Rules of Civil Procedure.

[4]       The facts of this case are largely undisputed.   (See
Pls.' Statement of Undisputed and Disputed Facts, filed Sept. 29,
2006 ("SUF")).

        Plaintiffs have also submitted a Separate Statement of
Additional Facts.   (Pls.' Separate Statement of Additional Facts,
filed Sept. 29, 2006 ("SAF")).   Many of these "facts," primarily
those based upon the Declaration of Kirsten Fisher, are rife with
argument and legal conclusions.   (See Decl. of Kirsten Fisher in
Opp'n of Mot. for Summ. J, filed Sept. 29, 2006 ("Fisher
Decl.")).   To the extent that the Separate Statement of
Additional Facts and Declaration of Kirsten Fisher recount actual
facts that have an appropriate foundation, the court considers
these facts.   To the extent that these documents assert argument
and legal conclusions, the court does not consider these "facts."

Specifically, Dr. Knoble was concerned about Fisher's mental

states as manifested by her concerns about toxic mold. (SUF ¶

1). Defendant Tracy Mae Alvarez ("Alvarez"), an ACCESS[5] social

worker for the Children's Systems of Care division for Placer

County HHS, received the referral. (Decl. of Tracy Mae Alvarez

in Supp. of Defs.' Mot. for Summ. J., filed Apr. 14, 2006,

("Alvarez Decl.") ¶ 3). Shortly thereafter, Jacklyn Nielsen,[6]

Fisher's mother, reported to Alvarez what appeared to be

irrational behavior by Fisher and the potential effect on

Fisher's daughters. (Alvarez Decl. ¶ 4).

Alvarez's role in the process was to make the preliminary

determination of Fisher's mental and emotional functioning and to

determine whether intervention by the County for the sake of

Fisher's children was required. (SUF ¶ 5). When it became clear

to Alvarez that the Fisher family required intervention, she

attempted to have Fisher agree to a voluntary plan of treatment.

(SUF ¶ 6; Alvarez Decl. ¶ 7). However, Fisher was afraid that

would lead to her children being taken from her and failed to

appear for a meeting with Alvarez. (SUF ¶¶ 6-7). Based upon the

information that Alvarez had received from Fisher's doctor, her

mother, and others, and given her refusal to meet to discuss a

voluntary plan, Alvarez obtained a warrant to take the minor

children into protective custody. (SUF ¶ 8; Alvarez Decl. ¶ 8).

---

[5]    ACCESS social workers are responsible for emergency
intervention to deal with families in crisis. (Alvarez Decl. ¶
2).

[6]    Plaintiffs assert in their opposition that Ms. Nielsen
has a history of mental health problems and is not credible.
However, plaintiffs present no evidence that defendants had
knowledge of any mental illness.

1  Alvarez anticipated that Fisher's instability would further

2  decompensate when her children were removed, and suggested that

3  another social worker accompany the one serving the warrant in

4  the event that Fisher needed to be placed on a three-day

5  psychiatric hold pursuant to California Welfare and Institutions

6  Code Section 5150 ("5150 hold").  (SUF ¶ 8; Alvarez Decl. ¶ 9).

7       On January 23, 2004, Defendant Diana Rose ("Rose"), a crisis

8  social worker, and peace officers came to the hotel room in which

9  plaintiffs were living.  (SUF ¶ 10; SUF ¶ 33).  Rose took custody

10 of the children and delivered them to their grandfather's house.

11 (SUF ¶ 33).  Rose allegedly told the children's grandfather that

12 the children could be there a "long time."  (SUF ¶ 34).  Rose has

13 no other involvement in this case.  (SUF ¶ 36).

14      Fisher was taken into custody because she stated that she

15 would kill herself if Child Protective Services took her

16 children.  (Discharge Summary, Ex. B to Decl. of David. K. Huskey

17 in Supp. of Defs.' Mot. for Summ. J. ("Huskey Decl."), filed Apr.

18 14, 2006, at 1).  She was placed in Heritage Oaks Hospital, a

19 psychiatric hospital, and Alvarez followed up on her care while

20 she was there.  (SUF ¶ 11; Alvarez Decl. ¶ 11).  Fisher was

21 discharged from Heritage Oaks Hospital on or about January 28,

22 2004.  The discharge summary provided that the on-call physician

23 noted that she was "very anxious" and "obsessed about mold."

24 (Discharge Summary at 2).  Her attending physician noted that

25 although she was not "deemed acute enough to be in inpatient

26 treatment," she continued "to perserverate on the mold situation,

27 however, in a more appropriate way."  (Discharge Summary at 2).

28 The Discharge Summary stated that Fisher did not "appear to be

4

1    overtly delusional" at the time of her discharge.  (Discharge

2    Summary at 2-3; SUF ¶ 13).

3        On January 29, 2004, Alvarez transferred the case to

4    defendant Antoinette Fabela ("Fabela"), the ongoing social worker

5    assigned to the case.  (SUF ¶ 9).  Alvarez did not have any

6    responsibility for the case once it was transferred to Fabela.

7    (Alvarez Decl. ¶ 13).  Once the transfer took place, Fabela had

8    responsibility for handling the Placer County Superior Court case

9    related to reunification of the Fisher family.  (Decl. of

10   Antoinette Fabela in Supp. of Defs.' Mot. for Summ. J., filed

11   Apr. 14, 2006, ¶ 1).

12       Shortly after taking over the case, Fabela familiarized

13   herself with the Discharge Summary as well as all other documents

14   in the file.  (Fabela Decl. ¶ 2).  Defendants present evidence

15   that the file information suggested to Fabela that Fisher was

16   behaving irrationally with respect to obtaining treatment for

17   alleged symptoms of toxic mold poisoning suffered by herself and

18   her children.  (Fabela Decl. ¶ 4).  Fabela contends that it was

19   not clear to her whether toxic mold or mental illness was causing

20   Fisher's irrational behavior.  Fisher provided Fabela with

21   material concerning the effects of toxic mold, which Fabela read

22   and considered.  (Fabela Decl. ¶ 9).  Fabela asserts that even if

23   the information provided by Fisher about toxic mold was true, she

24   believed that Fisher's focus on toxic mold and expression of

25   concern about it in front of her children, both of whom were

26   under ten years old at the time, were inappropriate and harmful

27   to the children.  (Fabela Decl. ¶ 10).

28   /////

On February 20, 2004, defendant Greg Geisler, a social worker for the County of Placer, filed a Jurisdiction/Disposition Report ("JDR") with the Placer County Superior Court. (Decl. of Greg Geisler in Supp. of Defs.' Mot. for Summ. J. ("Geisler Decl."), filed Apr. 14, 2004, ¶¶ 2-3). Geisler recommended that the children be removed from Fisher and placed in the home of a relative because he believed that there was a substantial danger to the physical health or physical and emotional well-being of the children if they were returned home. (Geisler Decl. ¶ 6). He believed that the Fisher children were suffering from severe emotional distress as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior. (Geisler Decl. ¶ 7). He also believed that Fisher's mental status appeared to be significantly compromised at the time that he interviewed her and the children. (Geisler Decl. ¶ 12). In the JDR, Geisler expressed his concerns about Fisher's mental health as follows:

> Regardless of whether or not Ms. Fisher is suffering from toxic mold related illnesses, continuously obsessing on her symptoms cannot be healthy for her or her children. If one were afflicted with AIDS, cancer or any other disease, one ought not to concern one's every hour with the subject. This would only bring about despondent depressions, and distraction, and worsen the situation. This seems to be happening in Ms. Fisher's case, and her children are suffering because of this. Regardless of whether toxic mold or other factors are responsible for her present mental state and apparent mental illness, she is nonetheless exhibiting symptoms of mental disorders that compromise her ability to parent. These, combined with her obsession with toxic mold, whether with a factual basis or not, have rendered Ms. Fisher incapable of parenting sufficiently to ensue [sic] her children's safety.

(Geisler Decl. ¶ 13). Fisher also told Geisler during the interview that she was not functioning well mentally. (Geisler Decl. ¶ 14). Fisher also admitted that she "had become obsessed with doctors" for her mold concerns and that she had been having

1   great difficulty getting things done in a timely manner.

2   (Geisler Decl. ¶¶ 15-16).  Geisler asserts that he was left with

3   an unclear picture regarding possible domestic violence in their

4   household.  (Geisler Decl. ¶ 17).  Geisler also asserts that

5   Fisher's father confirmed most of the concerns that others had

6   expressed about her mental health and inability to care for her

7   children.  (Geisler Decl. ¶ 18).  Fisher contends that Geisler

8   obtained accurate information in his report, but misinterpreted

9   what it meant.  (Dep. of Karen Fisher ("Fisher Dep."), Ex. A to

10  Huskey Decl., 158:10-12).

11      Fisher and Fabela entered into a voluntary Unified Services

12  Plan ("USP") on April 13, 2004.  (SUF ¶ 25).  The USP provided

13  that Fisher would be reunited with her children on condition that

14  she would not speak of toxic mold to her children, or to adults

15  in front of her children.  (SUF ¶ 24).  Fisher was free to

16  consult with doctors, lawyers or other professionals about mold

17  related issues outside the presence of her children.  (SUF ¶ 24).

18  The termination of the court proceeding occurred on April 14,

19  2005, and the Fisher family reunited that day.  (SUF ¶ 26).  The

20  term of the USP was from April 13, 2004 through July 14, 2004,

21  and Fisher believes that it was extended a month beyond that

22  date.  (SUF ¶ 27).

23      Less than two weeks after Fisher agreed to the conditions of

24  the USP, Fabela received a telephone call from Mr. Haney, an

25  environmental specialist, who was in his office with Fisher.

26  (Fabela Decl. ¶ 13; Decl. of Doug Haney in Opp'n to Defs.' Mot.

27  for Summ. J. ("Haney Decl."), filed Sept. 29, 2006, ¶¶ 2-3).  In

28  response to Fisher's further inquiry into the condition of the

7

1   USP regarding not speaking about toxic mold in front of her

2   children, Fabela allegedly told Fisher over the phone, "if you

3   choose to pursue this any further, you know what this will mean!"

4   (SUF ¶¶ 29-30).   Fabela took no adverse action against plaintiff

5   following the exchange over the telephone.  (SUF ¶ 31).  However,

6   Fisher understood Fabela's statement to be a threat that her

7   children would be taken away if she did not cooperate.  (SAF ¶

8   54).

9       Defendant Kevin Henderson ("Henderson") was the supervisor

10  of the ACCESS p.m. program in December 2003 and January 2004.

11  (SUF ¶ 42).  He had been the caseworker for Fisher when her

12  children were taken away from her in 1999 because of her threat

13  to commit suicide and kill her older daughter.  (SUF ¶ 42; Fisher

14  Dep. 77:22-78:3).  From that contact, Henderson became aware that

15  she had a history of abuse of methamphetamines.  (Decl. of Kevin

16  Henderson in Supp. of Defs.' Mot. for Summ. J. ("Henderson

17  Decl."), filed Apr. 14, 2004, ¶ 3; Fisher Dep. 77:8-11).

18  Henderson informed various social workers dealing with the case

19  of his experiences with the Fishers when he was a case worker

20  because he believed that Fisher's mental health background and

21  history of drug use was potentially relevant to the issues

22  involving reunification with her children.  (SUF ¶ 46).  Fisher

23  agrees that Henderson's information about the prior time that her

24  children were taken from her was relevant to the handling of her

25  case, but believes that Henderson improperly intervened in her

26  case from January 22, 2004 through April of 2004.  (SUF ¶¶ 43,

27  45).  Henderson did not supervise Fabela's handling of the case

28  /////

8

1  and did not have any direct involvement in the Fisher case in

2  2003 and 2004.  (Henderson Decl. ¶¶ 2, 5-6).

3     On April 20, 2005, plaintiffs filed a complaint against

4  defendants, alleging federal civil rights violations and

5  asserting pendant state tort claims.  On July 22, 2005, the court

6  issued an order, granting in part and denying in part defendants'

7  motion to dismiss.  (Mem. & Order, filed July 22, 2005, Docket #

8  22).  All of plaintiffs' § 1983 claims and Monell claims against

9  Placer County were dismissed, except plaintiffs' claims relating

10  to threatening comments by defendant Fabela.  (Id.)  Plaintiffs'

11  negligence and intentional infliction of emotional distress

12  claims for monetary relief were also dismissed, except to the

13  extent said claims are predicated on defendants' alleged

14  malicious failure to disclose exculpatory evidence.  (Id.)

15  Therefore, the remaining claims at issue in this case are (1)

16  plaintiffs' § 1983 claims arising out of defendant Fabela's

17  alleged threat; (2) plaintiffs' § 1983 claim against defendant

18  Placer County arising out of defendant Fabela's alleged threat;

19  (3) plaintiffs' state law claims predicated on defendants'

20  malicious failure to disclose exculpatory evidence; and (4)

21  plaintiffs' claims for injunctive relief.

22                              **STANDARD**

23     Summary judgment is appropriate when it is demonstrated that

24  there exists no genuine issue as to any material fact, and that

25  the moving party is entitled to judgment as a matter of law.

26  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144,

27  157 (1970).

28  /////

Under summary judgment practice, the moving party

always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. at 324. Indeed, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-289 (1968). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute

10

exists.  Fed. R. Civ. P. 56(e).  The opposing party must
demonstrate that the fact in contention is material, i.e., a fact
that might affect the outcome of the suit under the governing
law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986),
and that the dispute is genuine, i.e., the evidence is such that
a reasonable jury could return a verdict for the nonmoving party,
Id. at 251-52.

      In the endeavor to establish the existence of a factual
dispute, the opposing party need not establish a material issue
of fact conclusively in its favor.  It is sufficient that "the
claimed factual dispute be shown to require a jury or judge to
resolve the parties' differing versions of the truth at trial."
First Nat'l Bank, 391 U.S. at 289.  Thus, the "purpose of summary
judgment is to 'pierce the pleadings and to assess the proof in
order to see whether there is a genuine need for trial.'"
Matsushita, 475 U.S. at 587 (quoting Rule 56(e) advisory
committee's note on 1963 amendments).

      In resolving the summary judgment motion, the court examines
the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any.  Rule
56(c); SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir.
1982).  The evidence of the opposing party is to be believed, and
all reasonable inferences that may be drawn from the facts placed
before the court must be drawn in favor of the opposing party.
Anderson, 477 U.S. at 255.  Nevertheless, inferences are not
drawn out of the air, and it is the opposing party's obligation
to produce a factual predicate from which the inference may be
drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224,

1  1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

2      Finally, to demonstrate a genuine issue, the opposing party

3  "must do more than simply show that there is some metaphysical

4  doubt as to the material facts. . . . Where the record taken as a

5  whole could not lead a rational trier of fact to find for the

6  nonmoving party, there is no 'genuine issue for trial.'"

7  Matsushita, 475 U.S. at 586-87, 106 S. Ct. at 1356.

8                              **ANALYSIS**

9  **I.   42 U.S.C. § 1983 Claim**[7]

10     Plaintiffs assert that defendants violated their

11 constitutionally protected rights under the First and Fourteenth

12 Amendment when defendant Fabela threatened "if you choose to

13 pursue this any further, you know what this will mean!" in

14 response to a telephone call by Fisher about the restrictions in

15 the USP.

16     Plaintiffs contend that Fabela's threat violated their

17 rights under the Fourteenth Amendment.  Courts have analyzed

18 threats to remove a child from a family under the fundamental

19 right to familial relations, which includes the liberty interests

20 of parents in the care, custody and management of their children.

21 Doe v. Heck, 327 F.3d 492, 524 (7th Cir. 2003); King v. Olmsted

22 County, 117 F.3d 1065, 1066-68 (8th Cir. 1997).  The liberty

23 interest in maintaining the family unit is guaranteed by the

24

25     [7]   Plaintiffs' § 1983 claim is based solely on Fisher's
26 claim that her rights were violated by defendant Fabela's alleged
   threat over the telephone.  Plaintiffs present no evidence that
27 any of the other named individual defendants were involved in
   this conduct.  Therefore, defendants' motion for summary judgment
28 regarding plaintiffs' § 1983 claim against defendants Alvarez,
   Henderson, Rose, and Geisler is GRANTED.

1  Fourteenth Amendment.  <u>See</u> <u>Heck</u>, 117 F.3d at 523 n.29; <u>King</u>, 117
2  F.3d at 1066-68.  However, plaintiffs also contend that the
3  threat also violated Fisher's First Amendment rights by chilling
4  her speech about toxic mold.

5      In general, "mere verbal threats made by a state-actor do
6  not constitute a § 1983 claim."  <u>King</u>, 117 F.3d at 1067 (quoting
7  <u>Hopson v. Fredericksen</u>, 961 F.2d 1374, 1378 (8th Cir. 1992); <u>see</u>
8  <u>also</u> <u>Nunez v. City of Los Angeles</u>, 147 F.3d 867, 875 (9th Cir.
9  1998).  "The Constitution does not protect all intrusions on
10 one's peace of mind.  Fear or emotional injury which results
11 solely from verbal harassment or idle threats is generally not
12 sufficient to constitute an invasion of an identified liberty
13 interest."  <u>King</u>, 117 F.3d at 1067 (quoting <u>Pittsley v. Warish</u>,
14 927 F.2d 3, 7 (1st Cir. 1991) (holding that police officers
15 threat to children that "if we see your father on the streets
16 again, you'll never see him again" did not constitute a 14th
17 Amendment violation)); <u>see</u> <u>Lamar v. Steele</u>, 698 F.2d 1286 (5th
18 Cir. 1983); <u>Collins v. Cundy</u>, 603 F.2d 825, 827 (10th Cir. 1979).
19 Courts have held that "a threat constitutes an actionable
20 constitutional violation only when the threat is so brutal or
21 wantonly cruel as to shock the conscience, or if the threat
22 exerts coercive pressure on the plaintiff and the plaintiff
23 suffers the deprivation of a constitutional right."  <u>King</u>, 117
24 F.3d at 1067 (citing <u>Hopson</u>, 961 F.2d at 1378-79; <u>Bishop v.</u>
25 <u>Trace</u>, 622 F.2d 349, 354 (8th Cir. 1980)); <u>Mendocino Envtl. Ctr.</u>
26 <u>v. Mendocino County</u>, 192 F.3d 1283, 1300 (9th Cir. 1999).

27     The alleged threats made by Fabela do not rise to the level
28 of a constitutional violation in regards to plaintiffs rights to

13

familial relations.  Fabela did not follow up on the alleged
verbal threat and plaintiffs suffered no further adverse actions
from Fabela.  Fisher retained both legal and physical custody of
the children during the term of the USP.  See King, 117 F.3d at
1067-68.

Plaintiffs cite to the Seventh Circuit's opinion in Heck v.
Doe in support of their claim.  327 F.3d 492.  However, the facts
of Heck are readily distinguishable from the facts of this case.
There, the court held that threatening parents with removal of
their children, in the absence of any evidence giving rise to a
reasonable suspicion that the parent were abusing their children,
violated the parents' constitutional rights.  Id. at 520-21.  In
Heck, the defendant left a message on the parents voice mail,
"stating that if she had not heard from the parents' attorney
within 24 hours, 'the Bureau will take steps to . . . protect the
children in your home . . . under Chapter 48' and that she was
'not messing around anymore!'"  Id. at 524.  However, defendants
"had no basis to suspect the plaintiff parents of child abuse."
Id. at 525.  Therefore, defendants had no reason to interfere
with their familial relationships by threatening removal.  Id.

However, in this case, prior to the alleged threat, Fisher's
children had been removed from her based upon reports by Fisher's
family doctor and mother that they had concerns about Fisher's
ability to care for her children and further investigation by
ACCESS social workers.  Fisher had to be hospitalized after she
threatened to kill herself upon removal of the children.  The
Summary Discharge reports reflect that she was "obsessed about
mold" and continued "to perseverate on the mold situation" upon

14

discharge.  Geisler, a social worker with Placer County CPS, interviewed Fisher, her children, and her father, and reached the conclusion that Fisher's mental state, including her obsession with toxic mold, rendered her incapable of parenting sufficiently to ensure her children's safety.  Geisler also concluded that Fisher's continuous obsession about the symptoms of toxic mold was not healthy for her children.  (JDR, Ex. A to Geisler Decl., at 26).  Plaintiffs' social worker, Fabela, agreed with this conclusion.  A USP was entered into by Fisher and Fabela regarding conditions relating to the discussion of toxic mold in front of her children.  Not two weeks after entering into the USP, plaintiff began questioning the conditions of the USP relating to toxic mold, while she was at the office of an environmental specialist seeking assistance in regards to toxic mold.  It was in response to this questioning that Fabela made the alleged threat that if Fisher chose to pursue this any further, she knew what it would mean.  Under the circumstances,[8] the statement made by defendant Fabela, which did not overtly threaten removal and which was not acted upon, was not a constitutional violation.

In regards to plaintiffs' First Amendment claim, the court likewise finds that Fabela's threat did not amount to a

_____

[8]      Plaintiffs argue that all of the defendant social workers had no basis for their conclusion that Fisher was unable to care for her children.  These arguments are not supported by the evidence as defendants have provided evidence demonstrating that they received references from sources that knew Fisher and her children, conducted interviews, contacted other sources in making their determination.  Plaintiffs offer no evidence in rebuttal, except for plaintiffs' conclusory assertion that everyone else was wrong in their opinions.

1  constitutional violation.  Plaintiffs attempt to reassert a claim

2  that was already dismissed by this court based upon applicable

3  immunities.  The court previously held that defendants could not

4  be held liable for drafting "the USP with parameters under which

5  the court would approve the children being returned to Fisher's

6  custody . . . [b]ecause these actions were taken while in pursuit

7  of an outcome to the dependency proceedings."  (Mem. & Order,

8  filed July 22, 2005, Docket # 22, at 12).  Plaintiffs, however,

9  continue to argue that the conditions of the USP violate Fisher's

10  First Amendment rights.  They argue that defendant Fabela's

11  threat regarding Fisher's compliance with the conditions of the

12  USP served to chill her right to free speech because the

13  conditions of the USP violate her right to free speech.  This

14  argument is directly related to and intertwined with the

15  constitutionality of the provisions of the USP regarding Fisher

16  speaking about toxic mold in front of her children, a claim for

17  which the court has held that defendant Fabela has immunity.  As

18  such, the court does not entertain plaintiffs' attempt to make an

19  end-run around the court's prior rulings.  Defendant Fabela's

20  alleged threat that Fisher needed to comply with the conditions

21  of the USP and not pursue her alleged obsession with toxic mold

22  while bound by the conditions of the USP did not, by itself,

23  chill Fisher's First Amendment rights.

24      Therefore, because defendant Fabela's alleged threat did not

25  violate plaintiffs' First Amendment right to free speech or

26  Fourteenth Amendment right to familial relations, defendants'

27  motion for summary judgment regarding plaintiffs' § 1983 claim

28  against defendant Fabela is GRANTED.

16

**A.   Qualified Immunity**

Defendant Fabela argues that even if the alleged threat violated plaintiffs' constitutional rights, she is protected by qualified immunity.  The doctrine of qualified immunity protects from suit government officers who do not knowingly violate the law.  Gasho v. United States, 39 F.3d 1420, 1438 (9th Cir. 1994).  Qualified immunity is a generous standard designed to protect "all but the plainly incompetent or those who knowingly violate the law."  Burns v. Reed, 500 U.S. 478, 495 (1991) (citation omitted).  A government actor can establish qualified immunity by demonstrating (1) that the law governing the actor's conduct was not clearly established at the time of the challenged actions, or (2) that under the clearly established law, a government actor could reasonably have believed that the alleged conduct was lawful.  See Katz v. United States, 194 F.3d 962, 967 (9th Cir. 1999); Mendoza v. Block, 27 F.3d 1357, 1360 (9th Cir. 1994).

The question of immunity generally is not one for the jury.  Qualified immunity "'is an immunity from suit rather than a mere defense to liability' . . . .  [Therefore,] [i]mmunity ordinarily should be decided by the court long before trial."  Hunter v. Bryant, 502 U.S. 224, 228 (1991) (citation omitted).  The initial inquiry that the court must make to determine whether an official is entitled to qualified immunity is whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Saucier v. Katz, 533 U.S. 194, 201 (2001) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The next inquiry is whether the constitutional right was clearly

17

1    established.  Id.  This inquiry must be taken in the light of the

2    specific context of the case.  The contours of the right must be

3    sufficiently clear that a reasonable official would understand

4    that what he is doing violates that right.  Id.  The salient

5    question is whether the law at the time of the disputed conduct

6    gave defendants "fair warning that their alleged treatment of

7    plaintiffs was unconstitutional."  See Hope v. Pelzer, 536 U.S.

8    730, 741 (2002).  There must exist a clearly established rule so

9    that "it would be clear to a reasonable officer that his conduct

10   was unlawful in the situation he confronted."  Saucier, 533 U.S.

11   at 205-06.

12       Even if defendant Fabela's alleged threat gave rise to a

13   constitutional violation, Fabela did not have fair warning that

14   the alleged treatment of plaintiffs was unconstitutional.  The

15   law is not established in California or the Ninth Circuit that

16   such conduct could give rise to a constitutional violation of the

17   First or Fourteenth Amendment.

18       **B.   Monell Claim**

19       Plaintiffs assert that defendant County is liable under §

20   1983 because the County allegedly maintained a policy, custom, or

21   practice that caused defendant Fabela to violate plaintiffs'

22   rights through her alleged threat to Fisher.  Under Monell and

23   its progeny, a plaintiff may hold a municipality liable under

24   section 1983 if his injury was inflicted pursuant to city policy,

25   regulation, custom, or usage.  Chew v. Gates, 27 F.3d 1432, 1444

26   (9th Cir. 1994) (citing Monell, 436 U.S. at 690-91, 694).  The

27   existence of a county policy may be established in one of three

28   ways:

                                 18

> First, the plaintiff may prove that a [county] employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity. Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy. Whether a particular official has final policy-making authority is a question of state law. Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) (quoting Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (citations and internal quotations omitted)).  Assuming that a plaintiff can establish one of these three circumstances, he must then demonstrate that the municipal policy "caused" the constitutional deprivation.  Id.  A municipal policy "causes" injury where it is the "moving force" behind the violation. Chew, 27 F.3d at 1444 (citing Monell, 436 U.S. at 690-91, 694).

In this case, there is no evidence of a systemic failure to train social workers, no evidence of negligent hiring of social workers by Placer County, no evidence of routinely requesting USPS that regulate the content of speech, and no evidence of a policy of coercing families into unconstitutional USPs of any type.  There is also no evidence that defendant Fabela, the social worker who made the alleged threat to Fisher, was an official with final, policy-making authority.  Finally, there is no evidence that an official with final policy-making authority ratified defendant Fabela's conduct.

Plaintiffs argue that defendants' motion for summary judgment should be denied because plaintiffs' Monell claim

19

1   survived defendants' motion to dismiss.   This argument has no

2   merit.   Plaintiffs also argue that they have a <u>Monell</u> claim

3   against the County because defendants were "deliberately

4   indifferent."   Such conclusory statements, which do not remotely

5   address the requirements for substantiating a <u>Monell</u> claim,

6   provide no basis for this court to find a triable issue of fact

7   as to the County's liability.[9]   Plaintiffs point to no evidence

8   to support their <u>Monell</u> claim.   (<u>See</u> Pls.' Opp'n to Mot. for

9   Summ. J. ("Opp'n"), filed Sept. 29, 2006, at 18-22).   Further,

10  plaintiffs attempt to resurrect claims for which the court has

11  previously found the County immune.   (<u>See</u> Opp'n at 18-22; Mem. &

12  Order, filed July 22, 2005, Docket # 22).   Therefore, because

13  there is no evidence to support plaintiffs' claim that defendant

14  Placer County is liable for a violation of their constitutional

15  rights, defendants' motion for summary judgment is GRANTED.   <u>See</u>

16  <u>Mabe v. San Bernardino County</u>, 237 F.3d 1101, 1110-11 (9th Cir.

17  2001) (affirming the district court's grant of summary judgment

18  where plaintiff "adduced no evidence that the County had a policy

19  that both amounted to deliberate indifference to [plaintiff's]

20  constitutional rights *and* was the moving force behind a violation

21  of those rights").

22  **II.  State Tort Claims**

23        Plaintiffs allege state tort claims based upon defendants'[10]

24  _____

25        [9]     Plaintiffs also cite to <u>Wood v. Ostrander</u>, 879 F.2d
26  583, 588 (9th Cir. 1989), in support of their claim for municipal
    liability.   <u>Wood</u> is inapplicable.   There was no claim for, nor
    discussion of municipal liability in that case.

27        [10]    Plaintiffs do not address the liability of defendants
28  Alvarez or Rose in their opposition.   The court interprets this
                                                      (continued...)

1  malicious failure to disclose known exculpatory evidence in the

2  form of her Discharge Summary from Heritage Oaks hospital.  <u>See</u>

3  Cal. Govt. Code § 820.21 (excluding a social worker's malicious

4  failure to disclose known exculpatory evidence from statutory

5  immunity).  Defendants assert that even if the Discharge Summary

6  was exculpatory, defendants did not *maliciously* fail to disclose

7  known exculpatory evidence.  For purposes of § 820.21, "'malice'

8  means conduct that is intended . . . to cause injury to the

9  plaintiff or . . . conduct that is carried on . . . with a

10  willful and conscious disregard of the rights or safety of

11  others."  Cal. Govt. Code § 820.21.

12       **A.   Defendant Fabela**

13       Defendants present evidence that Fabela did not believe the

14  Discharge Summary was exculpatory and would require unification.

15  (Fabela Decl. ¶ 3).  The fact that Dr. Hirschaut found that

16  Fisher was not delusional at the time of her discharge did not

17  suggest to Fabela that the reported behaviors toward her children

18  were acceptable.  (Fabela Decl. ¶ 3).  Further, Fisher had a copy

19  of the Discharge Summary within two to three weeks of her

20  discharge from Heritage Oaks hospital.  (SUF ¶ 15).  Fabela did

21  not attempt to hide the document from Fisher or her counsel.

22  (Fabela Decl. ¶ 8).  Finally, Fisher testified at her deposition

23

24       [10](...continued)

25  silence as a non-opposition to defendants' motion with respect to
   these defendants.  Further, Alvarez transferred the case to

26  defendant Fabela on July 29, 2004, one day after the allegedly
   exculpatory report was issued, and had no further responsibility

27  for the case.  Rose's sole involvement in the case pertained to
   the removal of the Fisher children in January 2004.  Therefore,

28  defendants' motion for summary judgment regarding plaintiffs'
   state claim against defendants Alvarez and Rose is GRANTED.

that she liked Fabela because she believed that she has
integrity.  (Fisher Dep. 150:2-4).  She testified that she didn't
think that Fabela intentionally tried to hurt her or her
children.  (Fisher Dep. 150:8-9).  Finally, Fisher also testifies
that "the *only time* that [she] felt that Toni Fabela acted with
malice" was when "she reminded [her] that the mold issue is to be
dropped entirely," which Fisher perceived as a threat.  (Fisher
Dep. 140:2-8) (emphasis added).

Plaintiffs argue that Fabela took actions that had the
effect of hurting both Fisher and the children.  (Fisher Decl. ¶
2).  Plaintiffs also assert that Fabela knew or should have known
that Fisher was not delusional.  (Fisher Decl. ¶ 3).  However,
plaintiffs provide no evidence that Fabela withheld the allegedly
exculpatory Discharge Summary with the intent to injure plaintiff
or with willful or conscious disregard for the rights or safety
of others, i.e., *with malice.*  Nor do plaintiffs present evidence
to rebut defendants evidence of good faith, particularly Fisher's
own testimony that she did not think that Fabela intended to hurt
her or her children.  Therefore, defendants' motion for summary
judgment regarding plaintiffs' state claim against defendant
Fabela is GRANTED.

**B.   Defendant Geisler**

Defendants present evidence that Geisler does not recall
whether he read the Discharge Summary prior to preparing the JDR.
(Geisler Decl. ¶ 8).  However, after having read the Discharge
Summary, Geisler does not believe that it ruled out a mental
disorder that would justify taking custody of the Fisher children
away from Fisher.  (Geisler Decl. ¶ 8).  Rather, in Geisler's

judgment, Fisher's mental status appeared to be significantly compromised at the time of the interviews.  (Geisler Decl. ¶ 12). Geisler asserts that "at no time did [he] do anything other than discharge [his] duties as a social worker in a manner that I believed to be in the best interests of the Fisher family, which, based upon the information that [he] had, appeared to be an unstable and harmful environment for the Fisher children." (Geisler Decl. ¶ 20).

Plaintiffs argue that Geisler "is another county employee whom simply rubber stamped the notion that [Fisher] was delusional without ever having any substantial proof to back it up."  This argument, if true, asserts that defendant Geisler acted negligently by failing to properly investigate the matter, not with the requisite malicious intent.  However, plaintiffs offer no evidence to substantiate the assertion that Geisler was negligent or malicious in his conduct.  Therefore, defendants' motion for summary judgment regarding plaintiffs' state claim against defendant Geisler is GRANTED.

### C. Defendant Henderson

Defendant Henderson had no direct involvement in the Fisher case other than supervising defendants Rose and Alvarez during the emergency intervention.  Henderson did not supervise Fabela's handling of the case from January 29, 2004 onward.  Plaintiffs do not discuss a malicious failure to disclose known exculpatory evidence in reference to Henderson's potential liability. Rather, they assert that "it is clear that Mr. Henderson has a bias against [Fisher] and acted in a malicious manner to [her] detriment" based upon comments made by Henderson to Fabela about

23

1   Fisher's prior drug use.  (Opp'n at 26-17).  All of plaintiffs'

2   state law claims, except those relating to a malicious failure to

3   disclose exculpatory evidence, were previously dismissed by this

4   court.  (Mem. & Order, filed July 22, 2005, Docket # 22).

5   Because plaintiffs offer no argument and no evidence regarding

6   the remaining state law claim as it applies to defendant

7   Henderson, defendants' motion for summary judgment regarding

8   plaintiffs' state claim against defendant Henderson is GRANTED.

9   **III.  Injunctive Relief**

10      Plaintiffs also request injunctive relief "undoing [the]

11   unreasonable and illegal conditions, and protecting them from

12   further such conditions."[11]  (Compl. ¶ 32).  An injunction is an

13   equitable remedy.  "[T]he basis for injunctive relief in the

14   federal courts has always been irreparable injury and the

15   inadequacy of legal remedies."  Weinberger v. Romero-Barcelo, 456

16   U.S. 305, 312 (1982) (citations omitted).  A plaintiff seeking an

17   injunction based on alleged past wrongs must demonstrate that

18   there is a real and immediate threat that they will be wronged

19   again.  See City of Los Angeles v. Lyons, 461 U.S. 95, 102-03

20   (1983).  "Past exposure to illegal conduct does not in itself

21

22

23      [11]    Under federal law, absolute and qualified immunity are
    defenses to liability for damages only and do not bar actions for
    declaratory or injunctive relief.  Pulliam v. Allen, 466 U.S.

24   522, 539-40 (1984); American Fire, Theft & Collision Managers v.
    Gillespie, 932 F.2d 816, 818 (9th Cir. 1991); Shipp v. Todd, 568

25   F.2d 133. 134 (9th Cir. 1978).  See also Supreme Ct of Va v.
    Consumer Union, Inc., 446 U.S. 719 (1980).  Likewise, under

26   California law, immunity only shields public entities and
    employees from claims for monetary damages.  Cal. Govt Code §

27   814; Tehachapi-Cummings County Water District v. Armstrong, 49
    Cal. App. 3d 992, 999-1000(5th Dist. 1975).  Therefore, these

28   claims survived defendants' motion to dismiss on the basis of
    immunity.

1    show a present case or controversy regarding injunctive relief .

2    . . . if unaccompanied by any continuing, present adverse effects."

3    O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974).

4        In this case, defendants present undisputed evidence that

5    plaintiffs' state law CPS case was terminated on April 14, 2004,

6    and that the USP was completed in July or August 2004.  (SUF ¶¶

7    26-27).  As such, plaintiffs are no longer subject to the

8    allegedly "unreasonable and illegal conditions" of the USP for

9    which they seek injunctive relief.  Further, there is no evidence

10   that plaintiffs will be subjected to these same conditions in the

11   future.  Rather, defendants present evidence that Fisher's

12   children are presently in foster care because they were removed

13   from Fisher in February 2005, after officers found

14   methamphetamine paraphernalia in the trailer she was living in

15   with her boyfriend.  (SUF ¶ 48).  Fisher must complete counseling

16   and related conditions before she can be reunified with her

17   children.  (SUF ¶ 48).[12]  Plaintiffs have presented no evidence

18   to dispute defendants' evidence and make no arguments regarding

19   injunctive relief in their opposition brief.  As such,

20   defendants' motion for summary judgment regarding plaintiffs'

21   claims for injunctive relief is GRANTED.

22   /////

23   /////

24   /////

25   /////

26   _____

27   [12]    Defendant object to this fact on the basis that it is
     irrelevant.  However, whether Fisher's children are in her care
28   or in foster care is relevant to the need for the injunctive
     relief sought by plaintiffs.

25

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED.  The Clerk is directed to close this file.

IT IS SO ORDERED.

DATED: October 5, 2006

/s/ Frank C. Damrell Jr.
FRANK C. DAMRELL, Jr.
UNITED STATES DISTRICT JUDGE
